Doris RINGER, Plaintiff,

v.

Louis W. SULLIVAN, Secretary of
Health and Human Services,
Defendant.

Civ. A. No. 89–1358–T.

United States District Court,
D. Kansas.

Aug. 13, 1991.

Carol L. Boorady, Legal Services of
Wichita, Wichita, Kan., for plaintiff.

Stephen K. Lester, U.S. Atty.'s Office,
Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the
plaintiff's motion for an order reversing
the decision of the Secretary (Doc. 16) and
the Secretary's motion to affirm (Doc. 18).
This is a proceeding under Title II of the
Social Security Act, 42 U.S.C. § 401 et seq.

Plaintiff filed an application for disability
benefits under Title II. Tr. 98–101. The
claim was denied initially (Tr. 102–03, 106–
07) and on reconsideration (Tr. 110–11, 123–
24). On June 7, 1988, following a hearing,
an administrative law judge (ALJ) found
that the plaintiff was not under a disability
as defined in the Social Security Act. Tr.
25–32. On May 11, 1989, after considera-
tion of additional medical evidence, the Ap-
peals Council of the Social Security Admin-
istration issued a decision finding plaintiff
entitled to a period of disability commenc-
ing December 29, 1987, but not prior there-
to. Tr. 6–11. The decision of the Appeals
Council stands as the final decision of the
Secretary.

The standard of review in this case is
established by 42 U.S.C. § 405(g), which
provides that "[t]he findings of the Secre-
tary as to any fact, if supported by sub-
stantial evidence, shall be conclusive...."
Substantial evidence is that evidence which
a reasonable mind might accept as ade-
quate to support a conclusion. *Richardson
v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420,
1427, 28 L.Ed.2d 842 (1971); *Fowler v.
Bowen*, 876 F.2d 1451, 1453 (10th Cir.1989).
It is not the duty of the court to reweigh
the evidence, or substitute its decision for
that of the ALJ. *Talbot v. Heckler*, 814
F.2d 1456, 1461 (10th Cir.1987). Substan-
tial evidence, however, must be more than
a mere scintilla. *Perales*, 402 U.S. at 403,
91 S.Ct. at 1428. This court's determina-
tion entails a review of "the record as a
whole, and 'the substantiality of the evi-
dence must take into account whatever in
the record fairly detracts from its
weight.'" *Talbot*, 814 F.2d at 1461 (quot-
ing *Universal Camera Corp. v. NLRB*, 340
U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed.
456 (1951)). In applying these standards,
the court must keep in mind that the pur-
pose of the Social Security Act is to amelio-
rate some of the rigors of life for those
who are disabled or impoverished. *Dvorak*

*v. Celebrezze,* 345 F.2d 894, 897 (10th Cir. 1965).

For determining whether a Social Security claimant is disabled, the Secretary has developed a five step sequential evaluation. 20 C.F.R. § 404.1520; *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir.1988). If a determination of disability can be made at any one step, consideration of any subsequent steps is unnecessary. The relevant inquiry at step one is whether the claimant is engaged in substantial gainful activity. If not, step two requires the factfinder to determine whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). If the claimant does not have a listed impairment, step three entails determining "whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.* If there is no such equivalency, the claimant must show at step four that the "impairment prevents the claimant from performing work he has performed in the past." *Id.* At the fifth step, the factfinder must determine whether the claimant has the residual functional capacity "to perform other work in the national economy in view of his age, education, and work experience." *Id.* The Secretary bears the burden of proof at step five. *Id.,* 107 S.Ct. at 2294 n. 5; *Williams,* 844 F.2d at 751.

Plaintiff previously filed an application for disability insurance benefits under Title II on August 7, 1985, Tr. 78–81, which was denied initially on December 17, 1985. Tr. 82–84, 96–97. Plaintiff did not pursue this application further. The Appeals Council determined that the doctrine of res judicata did not apply to this decision. Thus, it considered the issue of plaintiff's disability back to April 27, 1983. Tr. 8. The issue before the court is whether the final decision of the Secretary as to the onset date of disability is supported by substantial evidence.

In her first application for disability benefits dated August 7, 1985, plaintiff stated she was disabled because of her back, asthma, congestive heart failure and arthritis. Tr. 142–50. In her second application for disability benefits filed on September 9, 1987, plaintiff claimed to be disabled due to problems with "back, heart, lungs, [and] depression" since April 27, 1983. Tr. 98.

Plaintiff was born on August 23, 1935 and was 52 years old at the time of the hearing. She completed the 10th grade and subsequently obtained her GED. Plaintiff's past work was as a waitress, an LPN in a hospital, and a sheet metal assembler in the aircraft industry. Tr. 320–331.

On March 10, 1980, plaintiff underwent surgery for a herniated nucleus pulposis at the L5–S1 interspace. Tr. 188–89. Plaintiff's treating physician was Dr. Anthony G.A. Pollock. In April 1980, Dr. Pollock felt that plaintiff had a large amount of psychological stress. Tr. 193. By June 1980, plaintiff seemed to be getting even more depressed. She complained of a constant ache in her back and some aching in her legs. Dr. Pollock felt she needed an extensive back rehabilitation program and some psychological follow-up. Tr. 194. In August 1980, plaintiff complained of lower back pain radiating toward the right buttock. A CT scan was scheduled for August 6, 1980. Tr. 194. The results of the scan showed that there was moderate bulging of the annulus fibrosis at L4–5, and a small central disc herniation at L5–S1. Tr. 201.

In an office visit on August 11, 1980, Dr. Pollock noted that the plaintiff seemed to be under extreme stress and gave a strong impression of being markedly depressed. Clinical examination showed a straight lumbar spine with much guarding in the paravertebral muscles and marked voluntary limitation of range of movement. Dr. Pollock found no neurologic deficit present in the lower limbs. Dr. Pollock reviewed the CT scan and disagreed with the radiologist's interpretation. In Dr. Pollock's opinion, the CT scan was within normal limits. Dr. Pollock felt plaintiff required anti-arthritic medication and anti-depressants. Tr. 197.

By the fall of 1980, plaintiff has been released to light work. In early 1981, plaintiff suffered from tension headaches, degenerative arthritis in her neck and pain

in her shoulder. Tr. 198. On March 17, 1982, Dr. Pollock examined plaintiff. Plaintiff had been helping someone at work the day before when she felt a snap in her back and pain in her left thigh radiating to the left leg. Dr. Pollock felt that plaintiff had almost certainly re-irritated her L5–S1 nerve root. Tr. 198. Dr. Pollock noted at the end of March 1982 that plaintiff was getting extremely depressed. Plaintiff was released to work in April 1982. Tr. 199.

On April 28, 1983, plaintiff was hospitalized at St. Francis Regional Medical Center for back pain. Plaintiff had been at work the day before and, while lifting an object weighing approximately 16 pounds, she felt a tearing sensation in her lower back. Plaintiff experienced severe pain which became more severe over the next few hours. Dr. Robert A. Rawcliffe, Jr., M.D., her attending physician, suggested that since plaintiff was in acute discomfort and because she lived alone, that she should be hospitalized for intensive conservative treatment. Tr. 226. Plaintiff was discharged on May 5, 1983 with a final diagnosis of lumbar strain. Tr. 216. While hospitalized, plaintiff completed an MMPI. Tr. 217.

On May 27, 1983, Dr. Rawcliffe discussed with plaintiff the results of her psychological testing. Dr. Rawcliffe told plaintiff that she was chronically depressed and noted that this could very well be contributing to her failure to improve. Dr. Rawcliffe then referred plaintiff to Dr. Harold McNamara, a clinical psychologist. Tr. 227.

Dr. McNamara provided a psychological report on plaintiff dated May 13, 1983. That report provided:

This forty-seven-year-old woman has had recurrent episodes with back pain since laminectomy and disc removal in 1980. There has been an additional recurrence of severe back and leg pain to which this individual has responded poorly with the usual conservative hospital treatment. She was referred for psychological testing to assess the degree of emotional reaction relative to the surgery and subsequent injury.

This individual has developed a significant body focus. There is some suggestion of an elaboration of physical symptomatology and perhaps an exaggeration of the effects of her injury, however, this is not a test pattern that would be clearly interpreted as indicative of a functional disorder.

This individual's emotional reaction to her most recent injury and her distressed emotional state related to her failure to improve are primarily consequences of the chronic depressive mood. She can be expected to be irritable, difficult, pessimistic, and fault-finding in her efforts to cope with the emotional disturbance.

Diagnostic Impression: a now chronic depressive syndrome most likely related to an adjustment reaction of adult life.

This is an individual who may respond to psychological counseling designed to help her adjust to what is at this point an unacceptable physical condition.

Tr. 239–40. Dr. McNamara suggested physical therapy because of plaintiff's phobia about her body and fear of moving her muscles beyond the point where they hurt. Tr. 228.

In July 1983, plaintiff reported to Dr. Rawcliffe that her back pain was improving, that physical therapy helped, and that she had had infrequent episodes of pain in the thoracic area over the preceding nine months. Tr. 229. Examination revealed a range of spine motion about 75% of normal and discomfort with straight leg raising at about 80–90 degrees on both sides. X-rays of the thoracic spine revealed only minimal degenerative changes. Dr. Rawcliffe advised that plaintiff see a cardiologist regarding the episodes of chest pain. Tr. 229.

By September 9, 1983, plaintiff could carry out a normal range of spine motion, although she did report some discomfort at extremes of flexion and hyperextension. Tr. 230. In November 1983, Dr. Rawcliffe informed plaintiff that he doubted she would ever be able to return to the type of work she had performed previously. Dr.

Rawcliffe's notes indicate that plaintiff had applied for vocational retraining. Tr. 230.

In November 1983, Dr. McNamara wrote a letter to the Division of Vocational Rehabilitation stating that plaintiff was ready and able to start vocational training. Tr. 265.

Treatment notes of Dr. Rawcliffe dated January 4, 1984 reflect that plaintiff had been doing exercises in a swimming pool at a health club. Plaintiff moved slowly and guardedly but could carry out a full range of motion of the lumbosacral spine in all directions. No neurological changes in the lower extremities were noted. Straight leg raising could be accomplished to 90 degrees on both sides without pain. Dr. Rawcliffe advised that plaintiff continue with her exercise program. He again noted that plaintiff would not be able to return to her previous occupation in sheet metal work. Dr. Rawcliffe noted that plaintiff had started to get some training through the Department of Vocational Rehabilitation. Dr. Rawcliffe estimated that plaintiff's permanent impairment of function was 20% of the body as a whole. Tr. 231.

In March 1984, the plaintiff experienced worsening back pain. Dr. Rawcliffe advised plaintiff to cut down on the dosage of aspirin and Tylenol because of potential side effects, to continue her exercise program as tolerated, and to talk to Dr. McNamara to see whether he might want her to resume taking Tofranil. Plaintiff was able to carry out a normal range of spine motion, although she complained of discomfort. Tr. 232–33.

By May 1984, plaintiff felt better and was able to carry out a full range of motion freely and without apparent discomfort. Straight leg raising was possible to a full 90 degrees on both sides with only tightness in the hamstrings. Tr. 234. In a July 17, 1984 office visit, Dr. Rawcliffe reported that physical examination was virtually unchanged from the last visit. Plaintiff reported more difficulties with her back due to the amount of sitting she had to do while attending school. Tr. 234. In a September 1984 exam, plaintiff was again unchanged. Plaintiff stated she had to quit school due to a lack of funds. Tr. 235. In a November 1984 examination, plaintiff was again essentially unchanged. Plaintiff was able to carry out a full range of motion of the spine without pain. She had some tightness in the hamstrings but no neurological changes in her lower extremity. Plaintiff reported that she was continuing to go to school. Tr. 236.

In February 1985, plaintiff returned to Dr. Rawcliffe. Plaintiff reported respiratory problems which aggravated her asthma. Increased coughing in turn aggravated her back symptoms. On physical examination, Dr. Rawcliffe found an excellent range of spine motion accomplished freely and without pain. Straight leg raising was possible easily to 90 degrees with no tightness or discomfort. No neurological changes in the lower extremities were noted. Tr. 237. On August 21, 1985, plaintiff's physical condition was unchanged. Tr. 285. By December 31, 1985, plaintiff's back problems had worsened after she fell in her home around Thanksgiving and was involved in a near collision while driving on December 30. Dr. Rawcliffe found that plaintiff appeared to be in a great deal of discomfort and moved very slowly and guardedly. Spine motion was limited to about 50% of normal in all directions. Tr. 285. By September 1986, plaintiff had an excellent range of lumbar spine motion. Tr. 286.

Plaintiff saw Dr. Michael W. Treweeke, M.D. on August 3, 1983. A treadmill test was reported to be normal. Tr. 229, 257. A chest x-ray on April 15, 1985 showed a markedly enlarged heart. The radiologist concluded that plaintiff suffered from prominent cardiomegaly and early congestive heart failure. Tr. 283. On September 20, 1985, plaintiff went to the emergency room at Wesley Medical Center complaining of coughing. Plaintiff was treated and released. Tr. 279. A chest x-ray revealed that the heart size was somewhat increased, although no previous films were available for comparison. The impression was cardiomegaly with signs of early failure. Tr. 284. A September 25, 1985 chest x-ray again revealed cardiac enlargement,

although the heart size was considerably smaller than on the previous film. Tr. 283.

In an August 17, 1983 letter to the Division of Rehabilitation Programs, Dr. Timothy W. Smith, M.D. stated that he had been treating plaintiff since December 1982. Dr. Smith stated that plaintiff suffered from moderate to severe asthmatic bronchitis. Dr. Smith further stated:

> She has been on maximal medication for this including bronchodilators and at one time steroids. She has been improved on this regimen of medications and probably can perform some work but cannot perform heavy physical activity. In addition, she should avoid dusty environments or environments with fumes or toxins. Certainly I think she could easily handle any sort of a job where a great dealt of exercise was not involved such as secretarial type or clerical work. I do not think she will be able to do activity requiring fair amounts of exertion.

Tr. 264. In a report dated August 16, 1985, Dr. Smith reported that pulmonary function tests administered in February 1985 revealed a mixed pattern with severe decrease in vital capacity and mild to moderate airway obstruction. In spite of medication, plaintiff continued to have daily wheezing. Tr. 266. Pulmonary function tests conducted September 30, 1985 were very difficult to interpret. Restrictive lung disease and mild obstructive disease were suggested. Tr. 268.

Plaintiff began seeing Dr. Theresa Johnson in September 1987 for problems with vaginal bleeding. Tr. 291. An endometrial biopsy and diagnostic D & C were performed. A hysterectomy was recommended. Tr. 293, 295. Pre-admission chest x-rays of October 28, 1987 revealed no evidence of active pulmonary pathology or cardia enlargement. Tr. 299. Pulmonary function tests revealed mild obstructive lung disease with good response to bronchodilators, consistent with moderate emphysema. Tr. 298. Plaintiff underwent a hysterectomy in December 1987.

In a questionnaire dated April 7, 1988, Dr. Johnson stated that plaintiff was disabled in April 1983 due to back pain. Tr. 350.

In April 1984, Dr. McNamara wrote to Aetna Life and Casualty, apparently the insurance company for plaintiff's employer. Dr. McNamara stated that psychological testing on February 21, 1984 was consistent with clinical observation of a worsening depressive reaction. Dr. Rawcliffe again placed plaintiff on Tofranil. Dr. McNamara stated, "It is our opinion that she will need to remain on antidepressive medication and in psychological counseling until she is able to return to work." Tr. 272. Plaintiff began taking Tofranil approximately June 1, 1983. Tr. 227. Plaintiff continued taking Tofranil as prescribed by Dr. Rawcliffe, although apparently not continuously, through at least September 1987. Tr. 286.

In an August 25, 1985 letter to the Disability Determination Services, Dr. McNamara stated that while there was no doubt that plaintiff was depressed, it was his opinion that the depression was not the cause of her disability. In Dr. McNamara's opinion, plaintiff's depressive syndrome was related to her inability to adjust to an unacceptable physical limitations that prevented her from returning to work. In Dr. McNamara's opinion, if plaintiff were able to return to work, her depression would be a more treatable condition and would not in and of itself be disabling. Tr. 267.

On March 24, 1986, Dr. McNamara wrote to the Workers Compensation Fund. Dr. McNamara noted that plaintiff's impairments had resulted in "a rather severe psychological impairment of a depressive nature." Tr. 288. Dr. McNamara stated that initially, both he and her treating physicians believed that, "with appropriate physical therapy and with psychological treatment she would be able to be vocationally rehabilitated, return to productive work, and regain her usual psychological adjustment." Tr. 288. Dr. McNamara continued:

> For awhile [sic] with medical treatment of her depression (i.e. being placed on Tofranil 100 milligrams hs. by her treat-

ing physician) and with the psychological support she did show some improvement. However, late last year as the reality of her failure to improve and her failure to become rehabilitated became clearer to her, she reacted with a worsening depressive reaction. While in the past her treatment was directed toward the rehabilitation process, now her treatment has to be directed toward her acceptance of her likely permanent disability.

. . . .

Doris Ringer's psychological treatment at this time is necessary to keep her functional and on an out-patient basis. There is reasonable reason to believe that without continuing psychological treatment she would regress and this would require lengthy hospitalization. On both economic and on personal grounds her remaining on an out-patient basis is by far the most desirable state of affairs.

Obviously the direction of Doris Ringer's treatment is related to helping her understand her irrational psychological reaction to impairment: that is, that it means that she is a worthless person. Secondly it is related to helping her accept reality that her impairment may permanently prevent her returning to productive physical labor if it happens that that is the case. At this point there is no way to know or to anticipate when she will no longer be in need on psychological treatment. Chronic situations of this type usually require long-term psychological treatment and support.

Tr. 289.

In another letter to the Disability Determination Services on September 29, 1987, Dr. McNamara stated that, in his opinion, the plaintiff was motivated to return to productive work. Dr. McNamara felt that there was no reason to believe that she was malingering or exaggerating her physical disabilities. Tr. 311. In Dr. McNamara's opinion, the interaction of plaintiff's physical disabilities and her depressive disorder rendered her incapable of productive work. Tr. 312.

Pulmonary function tests performed December 29, 1987 were interpreted as showing a moderate to severe obstructive lung defect. Tr. 313. Robert H. Blee, M.D. provided a report to the Appeals Council dated December 2, 1988. His report provided in part:

... The claimant did have a pulmonary function test on September 1985 (Exhibit 35) which was not submitted in accordance with the Social Security Regulations. In fact, the only truly usable pulmonary function data are submitted in Exhibit 43 dated December 1987. At that time, the claimant had a forced expiratory volume in one second of 1.3 liters and a forced vital capacity of 1.8 liters. This would suggest a combined obstructive and restrictive lung disease. The maximum voluntary ventilation was 49 liters per minute. Neither of these meets Listing 3.02 which would require an FEV1 of 1.2 liters and a maximum voluntary ventilation of 48 liters per minute.

Data contained in Exhibit 55 revealed that the claimant does have documented hypoxemia with a PO2 of 65 along with a PCO2 of 41, indicating arterial oxygen deficiency. Therefore, based on the pulmonary function data on hand, the claimant does not meet 3.02 of the Listing.

The question now is whether the combination of Listings would be equalled when the combined impairment of obstructive and restrictive lung disease is taken into conjunction with moderately severe depression. I would think that since the claimant's pulmonary function test concurrently is almost of Listing severity and the claimant certainly does have a severe problem with depression and has been on anti-depressant medications and is receiving extensive psychotherapy, that the depression would be an additive component to the respiratory problem and when the two are taken into consideration I feel that the claimant would equal 3.02 of the Listing.

The exact date of onset is obviously arbitrary but since the only adequate pulmonary function test is submitted in Exhibit 43, I would give the claimant the

**554**

date of onset to the combined period as of that date. Prior to that time a residual functional capacity for light work with avoidance of smoke, fumes, dust and etc, [sic] would be reasonable. Tr. 376–77.

In its decision, the Appeals Council found that the record failed to document findings to substantiate severe congestive heart failure or significant hypertension, as a treadmill stress test and echocardiogram were interpreted as essentially normal. The Council stated that the clinical findings did not reveal any significant deterioration or resultant functional loss associated with the allegations of back pain. Tr. 8.

The Appeals Council concurred with the written opinion of Dr. Blee that plaintiff's respiratory impairments equaled the requirements of Section 3.02 A and B, Appendix 1, Subpart P, Regulations No. 4, commencing December 29, 1987, but not prior thereto. The Appeals Council found that prior to December 29, 1987, plaintiff retained the residual functional capacity to perform a wide range of light to medium work not involving exposure to pulmonary irritants. The Council also found that the record did not establish a severe mental impairment for the period in issue. The Council considered Dr. McNamara's opinion of disability and rejected it. No mental status examination, psychological testing, or clinical interview data were provided. The Council found few convincing signs of depression. Tr. 9.

The Appeals Council found plaintiff's complaints of pain not consistent with the objective medical findings. According to the Council, the record documented periodic treatment for exacerbations of low back pain. The Council found the clinical and diagnostic data to be relatively consistent, as x-ray, range of motion, and neurological findings were not particularly significant. The recommended treatment was usually exercise therapy. Medications consisted usually of aspirin and Tylenol. The Council found that the plaintiff's chronic low back pain prior to December 29, 1987 appeared to have been intermittent and somewhat responsive to treatment. Tr. 10.

The Appeals Council made the following findings:

1. The claimant met the special earnings requirements of the Act on April 27, 1983, the date that the claimant stated she became unable to work and continued to meet them through December 31, 1988, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since April 27, 1983.

3. The claimant has the following severe impairments: bronchial asthma, hypertension with congestive heart failure by history, status post laminectomy, mild depression.

4. The claimant's pulmonary disorder is of severity to equal Section 3.20 A and B of Appendix 1 to Subpart P of the Regulations No. 4 as of December 29, 1987, but not prior thereto.

5. Accordingly the claimant was under a "disability" commencing December 29, 1987, but not prior thereto.

6. The statements regarding the severity of the claimant's condition and the restrictions imposed by her impairments are not supported by the clinical findings to the degree alleged prior to December 27, 1987.

7. The claimant has the residual functional capacity prior to December 29, 1987, to perform light to medium exertional work not involving exposure to pulmonary irritants.

8. The claimant's past relevant work as a sheet metal assembly worker did not require the above noted limitations.

9. The claimant's impairments do not prevent the performance of the past relevant work.

10. The claimant, therefore, was not under a "disability," as defined in the Social Security Act, at any time prior to December 29, 1987.

Tr. 10–11.

Plaintiff argues that the decision of the Secretary regarding onset date is not supported by substantial evidence on the

record as a whole. Specifically, plaintiff argues that the Appeals Council selectively abstracted evidence to support its findings and disregarded pertinent evidence; erroneously concluded that plaintiff's impairment began on the date diagnosed; discredited the testimony of plaintiff and her witness regarding plaintiff's pain; disregarded the fact that plaintiff was unable to complete vocational training and engaged in an unsuccessful work attempt; and rejected the opinion of plaintiff's treating psychologist.

None of the physicians who were treating plaintiff in 1983 believed that she was then disabled. Dr. Rawcliffe believed that plaintiff would benefit from vocational rehabilitation. By late 1983 and early 1984, Dr. Rawcliffe had determined that plaintiff could not return to her previous work. In the fall of 1983, Dr. Smith felt that plaintiff's lung condition would preclude heavy exertion and work around dust, fumes, or toxins. Dr. Smith believed that she could easily handle a more sedentary secretarial or clerical job. Plaintiff did pursue vocational rehabilitation.

It was not until September 1987 that Dr. McNamara opined that plaintiff was incapable of productive work. The Appeals Council was justified in rejecting his opinion due to a lack of medical findings, such as psychological tests. *See* 20 C.F.R. §§ 404.1527–404.1528.

Dr. Johnson stated in a questionnaire dated April 1988 that plaintiff was disabled since April 1983. Dr. Johnson was not plaintiff's treating physician in 1983. Dr. Johnson began treating plaintiff in September 1987. Dr. Johnson's opinion that plaintiff was disabled since April 1983 was contrary to the opinions of the physicians who were treating plaintiff during that time period.

Medical evidence is necessary to establish disability. 20 C.F.R. § 404.1512. The pulmonary function test of December 29, 1987 is the first medical evidence documenting an impairment that met or equaled the listings. Accordingly, December 29, 1987 was chosen as the onset date.

This court has previously reversed the Secretary for equating the date of onset of a mental illness with the date of diagnosis. *See Morrison v. Bowen,* 738 F.Supp. 1351 (D.Kan.1987). The court's rationale was that, particularly in the case of mental difficulties, a claimant often may be unaware of the illness and the need to obtain treatment. *Id.* at 1353 (citing *O'Farrell v. Secretary,* No. 84–1436 (D.Kan. April 9, 1985)). Such is not the case here. Dr. Rawcliffe suspected depression in the spring of 1983 and referred plaintiff to Dr. McNamara for treatment. Even as early as 1980, Dr. Pollock suspected depression. Plaintiff continued to work for several years after Dr. Pollock first suspected that plaintiff was depressed and might need psychological treatment. Plaintiff was also aware of her physical ailments and the need to obtain treatment.

The medical evidence reflects that plaintiff does have a pain-producing impairment. The record reflects periods without significant pain, according to the plaintiff herself. During those periods, plaintiff was capable of carrying out a full range of motion of the spine without pain. The record also reflects episodes of potentially disabling pain. These episodes of pain appeared to last for a few months at a time and would not satisfy the durational requirement to be disabling. The medical records reflect that plaintiff took aspirin or other nonprescription pain relievers for her back pain. Few prescription pain medications are reflected in the records.

If the court were sitting as finder of fact, the court would likely have come to a different conclusion regarding onset date. However, the court does not sit as the finder of fact in Social Security cases. Substantial evidence does support the Secretary's determination as to onset date.

IT IS BY THE COURT THEREFORE ORDERED that plaintiff's motion for an order reversing the decision of the Secretary (Doc. 16) is hereby denied.

IT IS FURTHER ORDERED that the defendant's motion to affirm the decision

of the Secretary (Doc. 18) is hereby granted.